Jonathan N. Shub CSB #237708
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
jshub@kohnswift.com

[Additional Counsel Listed On Signature Page]

Attorneys for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANNER KIRCHOFF, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>PhD FITNESS, LLC, a California Limited Liability Company,<br><br>              Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR:**<br>    **1.**    **VIOLATION OF WASH. REV. CODE § 19.86.010** *et seq.***;**<br>    **2.**    **VIOLATION OF CAL. CIV. CODE §§ 1750,** *et seq.***;**<br>    **3.**    **BREACH OF EXPRESS WARRANTY;**<br>    **4.**    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY;**<br>    **5.**    **NEGLIGENT MISREPRESENTATION;**<br>    **6.**    **INTENTIONAL MISPRERESENTATION; AND**<br>    **7.**    **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

160924

Tanner Kirchoff ("Plaintiff"), individually and on behalf of all others similarly situated, based on the investigation of counsel and his own individual knowledge as to Plaintiff's own circumstances, hereby complains against defendant PhD Fitness, LLC ("Defendant" or "PhD") as follows:

## I.    INTRODUCTION

1.    PhD formulates, manufactures, advertises and sells the popular Pre-JYM and Post-JYM sport supplements (the "Products") throughout the United States, including in California and Washington.  However, PhD markets these Products in a systematically misleading manner, stating that its products have characteristics and benefits that they do not.

2.    Defendant's multiple and prominent misrepresentations regarding its sport supplements form a pattern of unlawful and unfair business practices that harms the consuming public.

3.    Jim Stoppani, the face and member of Defendant PhD Fitness, LLC, boasts of his expertise in sports supplementation throughout his marketing materials and labels of the Products.  However, although Stoppani consistently claims that all of the ingredients in his products are scientifically supported and dosed properly, they are not.  In reality, Stoppani and Defendant PhD Fitness, LLC deceive consumers in the same exact way as their competitors.

4.    These actions violate a number of state consumer protections laws, including the Washington Unfair Business Practices Act ("WUBPA") and the California Consumer Legal Remedies Act ("CLRA").  Defendant's actions have injured Plaintiff and members of the Class, therefore Plaintiff seeks actual damages, restitution and/or disgorgement, punitive and statutory damages, and any injunctive or equitable relief deemed proper by the Court.

CLASS ACTION COMPLAINT

160924

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§1332(d), 1446, and 1453(b). Plaintiff alleges that he and the Class members are citizens of different states from Defendant, and the cumulative amount in controversy for Plaintiff and the Class exceeds $5 million, exclusive of interest and costs.

6.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, and because Defendant:

(a)    conducts business itself or through agent(s) in this District, by advertising, marketing, distributing and/or manufacturing its products in this District; and/or

(b)    is licensed or registered in this District; and/or

(c)    otherwise has sufficient contacts within this District to justify Defendant being fairly brought into Court in this District.

## III.    PARTIES

7.    Plaintiff Tanner Kirchoff ("Kirchoff") is, and at all times relevant hereto was a resident of Washington and a citizen of Washington. Plaintiff Kirchoff has purchased several of Defendant's products, including Pre-JYM and Post-JYM. Plaintiff Kirchoff most recently purchased Defendant's Pre-JYM and Post-JYM products at a GNC store located at 4630 25th Ave NE, Seattle, Washington approximately on October 3rd, 2016, but has also purchased these Products numerous times through Bodybuilding.com.

8.    Defendant PhD Fitness, LLC is a California Limited Liability Company with its headquarters in Thousand Oaks, California. PhD Fitness manufactures sports-oriented dietary supplement products. PhD manufactures, markets, advertises, distributes and sells a line of sport supplement products in California, Washington and

CLASS ACTION COMPLAINT

160924

throughout the United States. All of PhD's product labeling and advertising for its Pre-JYM and Post-JYM products, sold and distributed nationwide, are and were created, controlled and distributed by management located at PhD's Thousand Oaks, California headquarters.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Misrepresentations Regarding Defendant's Products Sold Exclusively at Bodybuilding.com.

9.   On July 19, 2013 PhD started the JYM dietary supplement line through an exclusive deal with online retail giant Bodybuilding.com by offering its products in interstate commerce.   On May 17, 2016 the exclusive deal between PhD and Bodybuilding.com expired.

10.   Every consumer that purchased the Products during this time period was exposed to the same materials which were at the point of purchase on the Bodybuilding.com website.

### Pre-JYM Claims

11.   Defendant claims that the Pre-JYM product uses "Proper Doses" and blames competitors of misleading consumers by stating that they are "still guilty of grossly underdosing ingredients":

**Proper Doses**
For the reasons detailed above, many supplement companies are moving toward transparency and axing proprietary blends. That's a good thing. However, these companies are still guilty of grossly underdosing ingredients.

12.   Defendant goes further in its misleading marketing claims by stating that the Pre-JYM product "contains 13 ingredients at proper, powerful doses" and "Full doses of 13 science-backed ingredients":

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

**No Concentrates**

Many companies also try to trick buyers by calling their pre-workout product "concentrated." A serving of one of these "concentrated" products can contain as few as 3 to 6 grams of powder. What kind of magic did they use to cram enough creatine, beta-alanine, citrulline, arginine, caffeine, and other ingredients into that tiny dose? They didn't use any magic, which is why all of those "concentrated" formulas also include proprietary blends. That's also why the serving size of Pre JYM is more than 26 grams. It contains 13 ingredients at proper, powerful doses.

## Pre JYM Features

- *Full doses of 13 science-backed ingredients.*
- *6 grams of citrulline malate to promote better muscle endurance and bigger muscle pumps.\**
- *6 grams of BCAAs in the 2:1:1 ratio best for blunting muscle fatigue, boosting muscle performance, and promoting muscle growth.\**
- *2 grams of creatine HCL for greater strength, endurance, and the promotion of muscle growth.\**
- *2 grams of CarnoSyn® beta-alanine to promote muscle power, strength, endurance, and muscle growth.\**
- *1.5 grams of betaine for greater power and strength during workouts.\**
- *600 milligrams of N-acetyl L-cysteine to blunt muscle fatigue and keep you training stronger, longer.\**
- *500 milligrams of betavulgaris L.(beet) extract to provide real nitric oxide donors for bigger pumps and better energy.\**
- *300 milligrams of caffeine to boost alertness and drive, increase muscle strength and endurance, during workouts for greater training intensity.\**
- *300 milligrams of Alpha-GPC for better drive, focus, and strength in the gym.\**
- *50 micrograms of huperzine A to increase mental focus and establish a stronger mind-muscle connection.\**
- *5 milligrams of BioPerine® to enhance absorption of the active ingredients in Pre JYM for even better results.\**

21    13.    However, the Pre-JYM product has ingredients which are not backed by

22  science, proven to be ineffective by scientific literature and many that are under-dosed

23  for the claims that they make.

24                                    *Creatine HCL*

25    14.    Defendant includes 2 grams of Creatine HCL which they claim produces

26  greater strength, endurance, and the promotion of muscle growth.

27    15.    This claim and dosage is based on the assumption that Creatine HCL

28

CLASS ACTION COMPLAINT

**160924**

produces the same results as Creatine Monohydrate at a much smaller dose ("micro-dosing") because Creatine HCL is more water-soluble.   There is absolutely no scientific backing that Creatine HCL produces greater strength, endurance, and muscle growth.

16.   In fact, the theory of micro-dosing is fatally flawed.

17.   First, Defendant fails to realize that the bioavailability of creatine is the key to the effectiveness of the compound, not the water-solubility.

18.   Bioavailability is determined by how much of the compound is absorbed into the blood and ultimately the muscles.

19.   Creatine Monohydrate has been found in a number of studies to be completely absorbed by the GI tract[1].   It has also been demonstrated that conversion of creatine to creatinine in the GI tract is negligible with respect to transit duration, suggesting that arterial bioavailability of CM is approximately 100%[2].

20.   Again, there is no scientific backing for the claims Defendant associates with Creatine HCL.

*CarnoSyn Beta-Alanine*

21.   Defendant adds 2 grams of CarnoSyn beta-alanine to promote muscle power, strength, endurance, and muscle growth.

22.   The patented beta-alanine product, CarnoSyn, that the Defendant includes in the Pre-JYM product lists the supported claims and the scientific studies that are

---

[1] *See* Chantuin A. The fate of creatine when administered to man. *J Biochem*. 67:29-41, 1926., *See also* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008.

[2] *See* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008. *See also* Persky A, Muller M, Derendorf J, Grant M, Brazeau G, Hochhaus G. Single- and multiple-dose pharmokinectics of oral creatine. *J Clin Pharmacol*. 43:29-37, 2003. *See also* Poortmans J, Auquier H, Renaut V, Durussel A, Saugy M, Brisson G. Effect of short-term creatine supplementation on renal responses in men. *Eur J Appl Physiol*. 76:566-67, 1997. *See also* Schedel J, Tanaka H, Kiyonaga A, Shindo M, Schutz Y. Actue creatine ingestion in human: Consequences on serum creatine an creatinine concentrations. *Life Sciences*. 65:2463-70, 1999.

CLASS ACTION COMPLAINT

160924

1  purported to support those claims on their website www.carnosyn.com.

2      23.    First, one study claims that CarnoSyn increases the working capacity of

3  muscle.[3]   However, the study was conducted with not only Carnosyn, but in

4  conjunction with Creatine Monohydrate.  Also, the participants ingested 1.6 grams of

5  CarnoSyn four times a day for the first six days and two times a day for the remaining

6  twenty-two days.  This dosing protocol is greater than Defendant's dosing of 2 grams

7  per serving.

8      24.    Second, another study claims that CarnoSyn increases muscle strength.[4]

9  The study participants were given a dosing protocol of 1.6 grams twice daily, again a

10  higher dose than Defendant's Pre-JYM product.

11      25.    Third, another study claims that CarnoSyn improves muscular

12  endurance.[5]  This dosing protocol was also higher than 2 grams per day where the

13  participants used 6 grams per day for the first 21 days and 3 grams per day for the

14  remaining 21 days.

15      26.    Also, a study that gave participants 4.8 grams per day of beta-alanine

16  failed to improve 400-M sprint times.[6]

17      27.    Further, there are no scientific studies that show this ingredient's efficacy

18  using one dose per day, at the recommended level contained within the Product.

19      28.    In fact, Jim Stoppani actually recommends two doses of 1.5-2g per day

20

21

22  [3]  Stout JR, et al., 2006. *Effects of twenty-eight days of beta-alanine and creatine monohydrate*
23  *supplementation on the physical working capacity at the neuromuscular fatigue threshold.* J Strngth
   & Cond. Rsrch, 20(4): 928-931.

24  [4]  Hoffman J, et al., 2006. *Effect of creatine and beta-alanine supplementation on performance*
   *and endocrine responses in strength/power athletes.* Int J Sport Nutr & Exer Metab., 16: 430-446.

25  [5]  Smith A E, et al., 2009. *Effects of beta-alanine supplementation and high level intensity interval*
26  *training on endurance performance and body composition in men—a double-blind trial.* J Int Soc
   Sports Nutr., 6: 5.

27  [6]  Derave W, et al., 2007. *beta-Alanine supplementation augments muscle carnosine content and*
28  *attenuates fatigue during repeated isokinetic contraction bouts in trained sprinters.* J Appl Physiol
   103(5):1736-43.

CLASS ACTION COMPLAINT

160924

1    and even states that 2-3g given twice per day "makes sense".[7]   Both of which are

2    obviously higher recommended dosing protocols than what he includes in the Pre-

3    JYM product.

*Betaine*

4

5    29.    The Pre-JYM product includes 1.5 grams of Betaine in the formulation

6    that Defendant claims provides "greater power and strength during workouts".

7    30.    There are numerous studies that show a modest increase in power output

8    after Betaine supplementation, but again, these dosing protocols were all at an

9    increased level of 2.5 grams per day.[8,9]

10    31.    There are also several studies that show at 2-2.5 grams per day of Betaine

11    actually have no effect on power output.[10,11,12]

*N-acetyl L-cysteine*

12

13    32.    The Pre-JYM product includes 600 mg of N-acetyl L-cysteine in the

14    formulation that Defendant claims "*blunt[s] muscle fatigue and keep you training*

15    *stronger, longer.*"

16    33.    There have been some studies showing this efficacy, but not at the dosing

17    protocol in the Pre-JYM product:

18    "Although there is technically an antifatigue effect associated with N-

19    Acetylcysteine, it require a very large dose as well as injections thereof; even

20

21    [7] *See* http://www.bodybuilding.com/fun/your-expert-guide-to-carnosyn-beta-alanine.html (Last visited October 21, 2016).

22    [8] Lee EC, et al. 2010. *Ergogenic effects of betaine supplementation on strength and power performance.* J Int Soc Sports Nutr. 7:27.

23    [9] Pryor JL, et al. 2012. *Effect of betaine supplementation on cycling sprint performance.* J Int Soc Sports Nutr 9(1):12.

24    [10] Trepanowski TF, et al. 2011. *The effects of chronic betaine supplementation on exercise performance, skeletal muscle oxygen saturation and associated biochemical parameters in resistance trained men.* J Int Soc Sports Nutr. Dec;25(12):3461-71.

25

26    [11] Hoffman JR, et al. 2011. *Effect of 15 days of betaine ingestion on concentric and eccentric force outputs during isokinetic exercise.* J Strength Cond Res. Aug;25(8):2235-41.

27    [12] Hoffman JR, et al. 2009. *Effect of betaine supplementation on power performance and fatigue.* J Int Soc Sports Nutr. Feb 27;6:7.

28

CLASS ACTION COMPLAINT

160924

1    then the antifatigue effect is small in magnitude"[13]

2

3                            *Alpha-GPC*

4        34.    The Pre-JYM product includes 300 milligrams of Alpha-GPC in the

5    formulation that Defendant claims provides "better drive, focus, and strength in the

6    gym".

7        35.    The only study that shows Alpha-GPC increases strength uses 600mg,

8    twice the dosing of Pre-JYM.[14]

9                             *Taurine*

10       36.    The Pre-JYM product also contains 1 gram of Taurine which Defendant

11   claims to aid in endurance, muscle strength and increase nitric oxide:

**1g of Taurine**

- Taurine is a specialized amino acid that is important for endurance and muscle strength. It can also increase nitric oxide (NO) production.*
- Exercise depletes taurine levels, thereby impairing strength and endurance, so it's helpful to get a dose of taurine before every workout.*

17       37.    There are no reliable scientific studies to support the claims Defendant

18   makes for its 1 gram of Taurine in the Pre-JYM product.

19

20                            *Bioperine*

21       38.    The Pre-JYM product also contains 5mg of Bioperine, which Defendant

22   claims "increases the absorption of those supplements by 30 to 2,000 percent":

23

24

25

26   _____

     [13]  *See* https://examine.com/supplements/n-acetylcysteine/ (Last visited October 3, 2016).

27   [14]  Ziegenfuss T, et al. 2008. *Acute supplementation with alpha-glycerylphosphorylcholine augments growth hormone response to, and peak force production during, resistance exercise.*
28   Journal of the International Society of Sports Nutrition20085 (Suppl 1):P15.

9

CLASS ACTION COMPLAINT

160924

**5mg of BioPerine®**

- BioPerine® is a patented extract of the fruit of black pepper, or long pepper, that contains standardized amounts of the active ingredient piperine.
- Numerous clinical studies suggest that when a 5 mg dose of BioPerine® is taken with other supplements, it increases the absorption of those supplements by 30 to 2,000 percent.*

39.     This claim may be true, but the studies that support these claims are for specific ingredients, none of which are contained within the Products.  These specific studies were only conducted on Beta-Carotene, CoQ10, Curcumin, Iron, Resveratrol, Selenium and Vitamin B6.[15]

40.     Again, this ingredient has no scientific backing as applied to these Products.

## Post-JYM Claims

41.     Defendant claims that the Post-JYM product has "proper dosing on all ingredients", "All eight of the ingredients in Post JYM are critical for recovery" and "Every single ingredient is included at the best dose to optimize repair and growth":

Like every JYM product, Post JYM contains no proprietary blends, proper dosing on all ingredients, no "abbreviated" formulas, no concentrates, and no BS. All eight of the ingredients in Post JYM are critical for recovery.* There is no filler. Every single ingredient is included at the best dose to optimize repair and growth.* That's the power, and promise, of Post JYM.

42.     But as shown in the Pre-JYM product Creatine HCL, CarnoSyn, Betaine, Bioperine are not properly dosed or have no scientific backing at all.

43.     Post-JYM also contains 3 grams of L-Glutamine which Defendant claims "ramp(s) up post-workout repair", "is important for muscle recovery and growth", and "Research suggests that supplementation with glutamine allows subjects to recover quicker between workouts":

---

[15] *See* http://www.bioperine.com/index.php/researchhighlight (Last visited October 24, 2016).

CLASS ACTION COMPLAINT

160924

Post JYM Active Ingredients Matrix also contains carnitine and glutamine, which are important to quickly ramp up post-workout repair.* In addition, you can also purchase Post JYM dextrose separately.

**3 grams of Glutamine**

- Glutamine is one of the most abundant amino acids in the body and is important for muscle recovery and growth.*
- Research suggests that supplementing with glutamine allows subjects to recover quicker between workouts.*
- Glutamine is also critical for optimal immune function.* Intense training can compromise your immune system, which can derail your training and results. Glutamine can help maintain a healthy immune system and keep your training and results on track.

44.     Simply because a substance, such as glutamine, is a nutrient, does not necessarily mean that its enhanced use is beneficial. Glutamine naturally found within the body does play a role in certain mechanisms supporting muscle growth, recovery and immunity support.

45.     However, as noted in the numerous scientific citations contained herein, glutamine supplementation has been found to be completely ineffective at mimicking these physiological responses.

46.     Simply put, the ingestion of L-Glutamine does absolutely nothing for the recovery from exercise, recovery of muscle tissue or ability to decrease muscle wasting (anti-catabolic).

47.     Defendant's recovery and muscle building claims, however, are blatantly false according to numerous scientific research papers, as contained herein.

48.     "Recovery" in bodybuilding is the process of the fatigued muscles to recuperate and grow after resistance training. This process enables the body to

CLASS ACTION COMPLAINT

160924

undergo muscle growth.

49.     In one study, glutamine failed to affect muscle protein kinetics of the test subjects.[16]

50.     In a study involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to 0.4 grams/kg, which revealed that glutamine supplement did not stimulate muscle protein synthesis.[17]

51.     Another study investigated the effect of L-glutamine supplementation on the plasma and muscle tissue glutamine concentrations of exercise-trained rats, both immediately and three hours after a single exercise session until exhaustion. In that study, rats were subjected to 60 minutes of swimming exercise daily for six weeks. During the final three weeks, one group was given a daily dose of L-glutamine (1 gram/kg). The plasma and muscle glutamine levels were higher than placebo during the post-exhaustive recovery period; however, this increase had no effect on the exercise swim test to exhaustion performance, suggesting that elevations in plasma and muscle glutamine levels have no benefit on muscle performance.[18]

52.     An additional study was also conducted to assess the effect of oral glutamine supplementation combined with resistance training in young adults.

[16] Gore D., Wolfe R. Glutamine supplementation fails to affect muscle protein kinetics in critically ill patients. *JPEN J Parenter Enteral Nutr*, 2002, 26:342-49.

[17] Svanberg E., Moller-Loswick A., Matthews D., Korner U., Lundholm K. The effect of glutamine on protein balance and amino acid flux across arm and leg tissues in healthy volunteers. *Clin Physiol*, 2001, 4:478-89.

[18] Rogero M., Tirapequi J., Pedrose R., Castro I., Pires I. Effect of alanyl-glutamine supplementation on plasma and tissue glutamine concentrations in rats submitted to exhaustive exercise. *Nutrition*, 2006, 22:564-71.

CLASS ACTION COMPLAINT

160924

Subjects received either placebo (0.9 grams/kg fat-free mass/day of maltodextrin) or L-glutamine (0.9 grams/kg fat-free mass/day) during six weeks of resistance training. Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups. This study demonstrated that L-glutamine supplementation during resistance training had no significant effect on muscle performance, body composition, or muscle protein degradation in young, healthy adults.[19]

53.    Moreover, a study was performed to examine the effects of a combination of effervescent creatine, ribose, and glutamine on muscle strength, endurance, and body composition in resistance-trained men. Subjects performed resistance training while ingesting either placebo or an experimental supplement (5 grams of creatine, 3 grams of glutamine, and 2 grams ribose) for eight weeks. Both groups significantly improved muscle strength, endurance, and fat-free mass, yet the groups were not significantly different from one another. Therefore, the experimental supplement, which included glutamine, was no more effective than placebo in improving skeletal muscle adaptation to resistance training.[20]

---

[19] Candow D., Chilibeck P., Burke D, Davison K., Smith-Palmer T. Effect of glutamine supplementation combined with resistance training in young adults. *Eur J Appl Physiol*, 2001, 86:142-49.

[20] Falk D., Heelan K., Thyfault J., Koch A. Effects of effervescent creatine, ribose, and glutamine supplementation on muscle strength, muscular endurance, and body composition. *J Strength Cond Res*, 2003, 17:810-16.

CLASS ACTION COMPLAINT

160924

54.     Another study sought to determine the effects of eight weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures.  Subjects were randomly assigned to receive either placebo for eight weeks, creatine monohydrate (0.3 grams/kg/day for one week and then 0.03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of glutamine per day while engaged in a resistance training program. Body mass and fat-free mass increased in the creatine and creatine + glutamine groups at a greater rate than with placebo. Additionally, the two experimental groups underwent a significantly greater improvement in the initial rate of muscle power production compared to placebo. These results suggest that the creatine and creatine + glutamine groups were equally effective in producing skeletal adaptation to resistance training and that glutamine apparently had no preferential effect in augmenting the results.[21]

55.     One study was performed to determine if high-dose glutamine ingestion affected weightlifting performance. In a double-blind, placebo-controlled, crossover study, resistance-trained men performed weightlifting exercises one hour after ingesting placebo (calorie-free fruit juice) or glutamine (0.3 g/kg) mixed with calorie-free fruit juice. Results demonstrated no significant differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises),

---

[21] Lehmkuhl M., Malone M., Justice B., Trone G., Pistilli E., Vinci D., Haff E., Kilgore L., Haff G. The effects of 8 weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. *J Strength Cond Res*, 2003, 17:425-38.

CLASS ACTION COMPLAINT

160924

indicating that the short-term ingestion of glutamine did not enhance weightlifting performance in resistance-trained men.[22]

56.    Similarly, another study sought to determine whether glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance. Trained males performed five exercise bouts on a cycle ergometer at 100% of maximal oxygen consumption.  The first four bouts were 60 seconds in duration, while the fifth bout was continued to fatigue.  Each bout was separated by 60 seconds of recovery. The exercise bouts were initiated 90 minutes after ingesting either placebo or 0.3 grams/kg of glutamine. Results showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between supplement conditions, indicating that the acute ingestion of L-glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males.[23]

57.    Another study determined whether oral glutamine, by itself or in combination with hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men.  Subjects ingested either placebo or 0.125 grams/kg of glutamine one hour before completing a brief high-intensity time-trial (approximately four minutes in duration). The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of glutamine

[22] Antonio J., Sanders M, Kalman D., Woodgate D., Street C. The effects of high-dose glutamine ingestion on weightlifting performance. *J Strength Cond Res*, 2002, 16:157-60.

[23] Haub M., Potteiger J., Nau K., Webster M., Zebas C. Acute L-glutamine ingestion does not improve maximal effort exercise. *J Sports Med Phys Fitness*, 1998, 38:240-44.

15

CLASS ACTION COMPLAINT

ingestion either alone or in combination with hyperoxia. Thus, there was no limiting effect of the tricarboxylic acid intermediate pool size on oxidative metabolism or performance during exercise.[24]

**B. Misrepresentations Regarding Defendant's Products Sold Exclusively at GNC.**

58.    After the expiration of the agreement between Defendant and Bodybuilding.com on May 17, 2016, Defendant began selling the Products exclusively through GNC, another dietary supplement retail giant.  GNC also maintains a website where the product pages for the Products reflect the exact descriptive language found on the Products' labels:

**Description**
JYM Supplement Science
Muscle Growth - Strength - Energy - Mind*

My Guarantee
Inside this bottle is decades of supplement research — from the lab and the gym. As a scientist, I have spent years researching ingredients that will produce results. As a gym rat, I have spent years benefiting from that research. Now it's your turn. Every ingredient in this formula is in a dose used in clinical studies and my own gym to produce significant gains in size, strength and endurance.* I know it works because this is what I take before every one of my workouts. Let it work for you. Hit the JYM!

---

[24] Marwood S., Botwell J. No effect of glutamine supplementation and hyperoxia on oxidative metabolism and performance during high-intensity exercise. *J Sports Sci*, 2008, 26:1081-90.

16

## Description

JYM Supplement Science
Muscle Growth - Endurance - Recovery

Over the decades I have spent in the gym experimenting with how muscles respond to training and the decades I have spent in the lab studying those responses at the cellular level, I have learned that the nutrients you take immediately after working out are just as critical as those you take to prime your body before workouts. After you've put in your last rep, your body is desperate for the ingredients that will help it refuel, recover and, in the process, grow bigger and stronger. Those ingredients, in full research-backed doses, are in this bottle. Post JYM is the perfect companion to Pre JYM. It's my personal post-workout formula for maximizing recovery, muscle growth and performance*. Make it yours to help you optimize your results in the gym. Hit the JYM!

59.     Both the GNC and Bodybuilding.com versions of the Products contain the ingredients at issue here, at the same doses.

60.     The Pre-JYM product states "Every ingredient in this formula is in a dose use in clinical studies and my own gym to produce significant gains in size, strength and endurance."   As shown above, the majority of these ingredients are not properly dosed, have no scientific backing or simply found to be completely ineffective, making Defendant's claims on the Pre-JYM label demonstrably false.

61.     The Post-JYM product states "Those ingredients, in full research-backed doses, are in this bottle."   As shown above, the majority of these ingredients are not properly dosed, have no scientific backing or simply found to be completely ineffective, making Defendant's claims on the Post-JYM label demonstrably false.

62.     Also, beyond these false claims regarding the ingredients contained within the Products, Jim Stoppani himself on InstaGram admits that the Products contain Sodium even though they are not listed on the labels, as required by State and Federal Law:

CLASS ACTION COMPLAINT

160924



63.     Apparently Defendant believes a social media post will resolve the illegality rather than issuing a recall.

64.     Defendant's deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food (including dietary supplements) misbranded when the label contains a statement that is "false or misleading in any particular."

65.     Defendant's deceptive statements also violate WASHINGTON STATUTE RCW 69.04.250 which also deem food (including dietary supplements) misbranded when the labels contains a statement that is "false or misleading in any particular."

66.     The difference between the Products promised and the Products sold is significant and material.  The efficacy of ingredients has real impacts on the benefits provided to consumers by the Products and the actual value of the Products.

67.     Had Plaintiff and members of the Class known the true nature of the Products, they would not have purchased Defendant's Products or alternatively paid

CLASS ACTION COMPLAINT

160924

1  significantly less for them.

2  ## V.    CLASS ACTION ALLEGATIONS

3      68.    Plaintiff bring this action as a class action pursuant to Federal Rule of

4  Civil Procedure 23 for the following Class of persons:

6      **Nationwide Class**:   All persons in the United States who, purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

8      **Washington Sub-Class**:    All persons residing in the State of Washington who, purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

10  Excluded from the Class are all legal entities, Defendant herein and any person, firm,

11  trust, corporation, or other entity related to or affiliated with Defendant, as well as any

12  judge, justice or judicial officer presiding over this matter and members of their

13  immediate families and judicial staff.

14      69.    Plaintiff reserves the right to amend the Class definition if further

15  investigation and discovery indicates that the Class definition should be narrowed,

16  expanded, or otherwise modified.

17      70.    While the exact number of Class members is unknown to Plaintiff at this

18  time, and will be ascertained through appropriate discovery, Plaintiff is informed and

19  believe that there are tens of thousands of members in the proposed Class.  The

20  number of individuals who comprise the Class are is so numerous that joinder of all

21  such persons is impracticable and the disposition of their claims in a class action,

22  rather than in individual actions, will benefit both the parties and the courts.

23      71.    Plaintiff's claims are typical of the claims of the other members of the

24  Class. All members of the Class have been and/or continue to be similarly affected by

25  Defendant's wrongful conduct as complained of herein, in violation of federal and

26  state law.  Plaintiff is unaware of any interests that conflict with or are antagonistic to

27  the interests of the Class.

28

CLASS ACTION COMPLAINT

160924

72.     Plaintiff will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in consumer class action lawsuits and complex litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff is aware of his duties and responsibilities to the Class.

73.     Defendant has acted with respect to the Class in a manner generally applicable to each Class member. Common questions of law and fact exist as to all Class members and predominate over any questions wholly affecting individual Class members. There is a well-defined community of interest in the questions of law and fact involved in the action, which affect all Class members. Among the questions of law and fact common to the Class are, *inter alia*:

(a)     Whether Defendant labels, markets and otherwise advertises its Products in a deceptive, false, or misleading manner;

(a)     Whether Defendant's Products contain any amount of sodium that would warrant its disclosure on the Products' label;

(b)     Whether Defendant's mischaracterization of the Products constitutes unlawful, unfair and fraudulent acts under Washington Unfair Business Practices Act ("WUBPA").

(c)     Whether Defendant's sale of the Products constitutes unfair methods of competition and unfair or deceptive acts or practices in violation of, *inter alia*, CAL. BUS. & PROF. CODE §§ 1770 *et seq.*, including:

(i)     Whether Defendant misrepresents the source, sponsorship, approval, or certification of the Products;

(ii)     Whether Defendant misrepresents that its Products have benefits which they do not have;

(iii)     Whether Defendant represents that its Products are of a particular standard or quality if it is of another; and

CLASS ACTION COMPLAINT

160924

1    (iv) Whether Defendant advertises its Products with intent not to sell

2 them as advertised;

3   (d) The nature and extent of damages, restitution. equitable remedies, and

4 declaratory and injunctive relief to which Plaintiff and the Class are entitled; and

5   (e) Whether Plaintiff and the Class should be awarded attorneys' fees and the

6 costs of suit.

7   74. A class action is superior to all other available methods for the fair and

8 efficient adjudication of this controversy since joinder of all members is impracticable.

9 Furthermore, as the damages suffered by individual Class members may be relatively

10 small, the expense and burden of individual litigation make it virtually impossible for

11 Class members to individually redress the wrongs done to them.  There will be no

12 difficulty in managing this action as a class action.

13   75. Defendant has acted on grounds generally applicable to the entire Class

14 with respect to the matters complained of herein, thereby making appropriate the relief

15 sought herein with respect to the Class as a whole.

## FIRST COUNT

### Violation of The Unfair Business Practices Act
### (Wash. Rev. Code § 19.86.010 *et seq*.)
### (On Behalf of the Washington Sub-class )

20   76. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

22   77. Defendant engaged in unfair and deceptive acts or practices, including but

23 not limited to engaging in part of a scheme or plan to mischaracterize the Products'

24 ingredients. These acts and practices had the capacity to deceive a substantial portion

26 of the public.

CLASS ACTION COMPLAINT

160924

78.     Defendant's unfair deceptive acts or practices occurred in the conduct of trade or commerce in that Defendant was engaged in the sale of the Products.

79.     Defendant's unfair deceptive acts or practices have an impact on the public interest because defendants deceive consumers as to the characteristics, ingredients and attributes of their Products. Such misrepresentations cause financial harm to purchasers who would not have otherwise purchased the Products

80.     Plaintiff relied on Defendant's misrepresentations.

81.     As a result, Plaintiff suffered damages to his property and business, in the form of economic and financial damages in addition to costs and reasonable attorneys' fees.

## SECOND COUNT

**Violation of CAL. CIV. CODE §§ 1750, *et seq.*-
Misrepresentation of a Product's standard, quality,
sponsorship, approval, and/or certification
(On Behalf of the Nationwide class)**

82.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

83.     Defendant's Products are "goods" as defined by California Civil Code §1761(a).

84.     Defendant is a "person" as defined by California Civil Code §1761(c).

85.     Plaintiff and the Class members are "consumers" within the meaning of California Civil Code §1761(d) because they purchased their Products for personal, family or household use.

86.     The sale of Defendant's Products to Plaintiff and the Class members is a "transaction" as defined by California Civil Code §1761(e).

22

CLASS ACTION COMPLAINT

160924

87.     Defendant violated California Civil Code §§ 1770(a)(2), (5), (7) and (9), as it misrepresented the standard, quality, sponsorship, approval, and/or certification of its Products.

88.     As a result of Defendant's conduct, Plaintiff and Class members were harmed and suffered actual damages as a result of Defendant's unfair competition and deceptive acts and practices. Had Defendant disclosed the true nature and/or not falsely represented its Products' ingredients, Plaintiff and the Class Members would not have been misled into purchasing Defendant's Products, or, alternatively, pay significantly less for them.

89.     Additionally, misbranded food products cannot legally be manufactured, held, advertised, distributed or sold. Thus, misbranded food has no economic value and is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of the purchase price of the misbrand food.

90.     Plaintiff, on behalf of himself and all other similarly situated consumers, and as appropriate, on behalf of the general public of the Nationwide Class, seeks injunctive relief prohibiting Defendant continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2).

91.     Plaintiff provided Defendant with notice of its alleged violations of the CLRA pursuant to California Civil Code § 1782(a) *via* certified mail, demanding that Defendant correct such violations.

92.     If Defendant fails to respond to Plaintiff's CLRA notice within 30 days, Plaintiff may amend his Complaint to seek all available damages under the CLRA for all violations complained of herein, including, but not limited to, statutory damages, punitive damages, attorney's fees and cost and any other relief that the Court deems proper.

CLASS ACTION COMPLAINT

160924

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD COUNT

**Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

93.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

94.   Plaintiff and each member of the Class formed a contract with Defendant at the time Plaintiff and the other members of the Class purchased one or more of the Products.  The terms of that contract include the promises and affirmations of fact made by Defendant on the packaging of the Products regarding the Products' ingredients.

95.   The Products' packaging constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Nationwide Class on the one hand, and Defendant on the other.

96.   All conditions precedent to Defendant's liability under this contract have been performed by Plaintiff and the Class.

97.   Defendant breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the products that could provide the benefits promised, as alleged above.

98.   As a result of Defendant's breach of its contract, Plaintiff and the Class have been damaged in the amount of the different purchase price of any and all of the Products they purchased and the price of a product which provides the benefits and contents as warranted.

### FOURTH COUNT

**Breach of Implied Warranty of Merchantability**
**(On Behalf of the Nationwide Class)**

99.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

100.   Defendant, through its acts and omissions set forth herein, in its sale,

CLASS ACTION COMPLAINT

160924

marketing and promotion of the Products, made representations to Plaintiff and the Class that the Products contained scientifically backed and properly dosed ingredients they do not contain.

101.   Plaintiff and the Class bought the Products manufactured, advertised, and sold by Defendant.

102.   Defendant is a merchant with respect to the goods of this kind that were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other Members of the Class an implied warranty that those goods were merchantable.

103.   Defendant breached the warranty implied in the sale of goods in that the Products do not contain scientifically backed and properly dosed ingredients.  Absent these scientifically backed and properly dosed ingredients, the Products are not fit for the intended purpose.

104.   As a result of Defendant's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

105.   As a result of Defendant's breach of its contract, Plaintiff and the Class have been damaged in the amount of the entire purchase price of the Products.

## FIFTH COUNT

### Negligent Misrepresentation
### (On Behalf of the Nationwide Class)

106.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

107.   Defendant has made material misrepresentations of fact concerning the nature of the ingredients in the Products.

108.   Defendant has and had no reasonable basis for believing that its misrepresentations were true.

109.   Defendant knew, or should have known, that Plaintiff and the Members

CLASS ACTION COMPLAINT

160924

of the Class would rely on the false representations about the nature of, and ingredients in, the Products.

110.   Defendant's false representations about the ingredients of the Products are objectively material to reasonable consumers, and therefore reliance upon such representations may be presumed as a matter of law.

111.   Plaintiff and Members of the Nationwide Class reasonably relied to their detriment on Defendant's false representations, which caused them to purchase the Products.

112.   As a proximate result of Defendant's negligent misrepresentations, Plaintiff and Members of the Nationwide Class have been damaged.

## SIXTH COUNT

### Intentional Misrepresentation
### (On Behalf of the Nationwide Class)

113.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

114.   Defendant has intentionally made material misrepresentations of fact concerning the nature of the ingredients in the Products.

115.   Defendant knew that the intentional misrepresentations herein were false at the time they were made.

116.   Defendant intended that Plaintiff and Members of the Class would rely on the false representations and purchase Defendant's Products.

117.   Defendant's false representations are objectively material to reasonable consumers and therefore reliance upon such representations may be presumed as a matter of law.

118.   Plaintiff and Members of the Class reasonably relied to their detriment on Defendant's intentional misrepresentations.

119.   Defendant's intentional misrepresentations were a substantial factor in

26

1   causing Plaintiff and Members of the Class to purchase the Product.

2       120.   Defendant has acted with malice by engaging in conduct that was and is

3   intended to cause injury to Plaintiff and the Members of the Class.

4       121.   Defendant   has   committed   fraud   through   its   intentional

5   misrepresentations, deceit, and/or concealment of material facts known to Defendant

6   with the intent to cause injury to the purchasers of the Products.

7       122.   As a proximate result of Defendant's intentional misrepresentations,

8   Plaintiff and the Members of the Nationwide Class suffered an ascertainable loss and

9   are entitled to relief and compensatory and punitive damages, in an amount to be

10   determined at trial.

11

12   **SEVENTH COUNT**
     **Unjust Enrichment**

13   **(On Behalf of the Nationwide Class)**

14       123.   Plaintiff hereby incorporates by reference the preceding paragraphs of

15   this Complaint.

16       124.   Defendant knew that the Products did not contain all scientifically

17   supported and properly dosed ingredients, and it knowingly misrepresented the

18   Product's ingredients to Plaintiff and the Nationwide Class.

19       125.   As a result of its fraudulent acts and omissions related to the Products,

20   Defendant obtained monies that rightfully belong to the Plaintiff and the Members of

21   the proposed Nationwide Class, and retained those monies to the detriment of

22   Plaintiff and the Members of the proposed Nationwide Class.

23       126.   It would be inequitable and unjust for Defendant to retain these

24   wrongfully obtained monies. Plaintiff and the proposed Nationwide Class are entitled

25   to restitution of the monies unjustly obtained, plus interest.

26   **VI.   PRAYER FOR RELIEF**

27   WHEREFORE, Plaintiff and the Class pray for relief and judgment as follows:

28

CLASS ACTION COMPLAINT

**160924**

A.    For an order declaring that this action is properly maintained as a class action and appointing Plaintiff as representative for the Class, and appointing Plaintiff's counsel as Class counsel;

B.    That Defendant bear the costs of any notice sent to the Class;

C.    For an order awarding Plaintiff and the members of the Class actual damages, restitution and/or disgorgement;

D.    For an order enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

E.    For restitution of the funds that unjustly enriched Defendant at the expense of the Plaintiff and Class Members.

F.    For an order awarding Plaintiff and the members of the Class pre- and post-judgment interest;

G.    For an order awarding attorneys' fees and costs of suit, including expert's witnesses fees as permitted by law; and

H.    Such other and further relief as this Court may deem just and proper.

## VII.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

Respectfully submitted,

Dated: November 8, 2016            By:/s/ Jonathan N. Shub

Jonathan N. Shub CSB #237708
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
jshub@kohnswift.com

28

CLASS ACTION COMPLAINT

**160924**

Nick Suciu III, Esq. (*Pro Hac Vice* Application Forthcoming)
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472
nicksuciu@bmslawyers.com

Bassma Zebib (SBN 276452)
**LAW OFFICE OF BASSMA ZEBIB**
811 Wilshire Blvd, Ste. 1708
Los Angeles, CA 90017
Telephone: (310) 920-7037
bassma@zebiblaw.com

Samuel J. Strauss (*Pro Hac Vice* Application Forthcoming)
**Turke & Strauss LLP**
936 N. 34th Street
Suite 300
Seattle, WA 98103
(608) 237-1775
sam@turkestrauss.com

Attorneys for Plaintiff and the Putative Class

CLASS ACTION COMPLAINT

160924